UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

JULIE A. SU, Acting Secretary of Labor,
UNITED STATES DEPARTMENT OF LABOR,

    Plaintiff,

v.

UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF
AMERICA LOCAL 140, a/k/a UAW
LOCAL 140, a/k/a LOCAL UAW 140,
d/b/a LOCAL UNION NO. 140 UAW
BUILDING CORPORATION,

    Defendant.
_____/

Case No. 24-cv-13140

Honorable

# COMPLAINT

Plaintiff Julie A. Su, Acting Secretary of Labor, alleges as follows:

## NATURE OF THE ACTION

1. This action is brought under Title IV of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA" or "the Act"), 29 U.S.C. §§ 481–483, for a judgment declaring that the May 14, 2024 election of union officers conducted by Local 140, United Automobile, Aerospace and Agricultural Implement Workers of America ("Local 140" or "Defendant") for the offices of President, Trustee, and Executive Board Member At Large is void, and directing

Defendant to conduct a new election for these offices under Plaintiff's supervision, and for other appropriate relief.

## JURISDICTION AND VENUE

2.  This Court has jurisdiction over this action pursuant to 29 U.S.C. § 482(b), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

3.  Venue lies in this district pursuant to 29 U.S.C. § 482(b) and 28 U.S.C. § 1391(b).

## PARTIES

4.  Plaintiff Julie A. Su is the duly appointed Acting Secretary of Labor, United States Department of Labor. Plaintiff is authorized to bring this action under section 402(b) of Title IV of the Act, 29 U.S.C. § 482(b).

5.  Defendant is, and has been at all times relevant to this action, an incorporated association maintaining its principal office in Warren, Michigan, within the jurisdiction of this District.

## FACTUAL ALLEGATIONS

**A. Local 140 and Election Basics**

6.  Defendant is, and has been at all times relevant to this action, a local labor organization engaged in an industry affecting commerce within the meaning of section 3(i) and (j) and 401(b) of the Act, 29 U.S.C. §§ 402(i) and (j) and 481(b).

2

7. At the time of the election, Defendant had approximately 4,000 members.

8. Defendant's primary employer is Stellantis Warren Truck Plant ("WTP"), located in Warren, Michigan.

9. Defendant also has members that work at Caravan, the janitorial company that services WTP; Hydroclean Industrial Services, a janitorial company that handles chemicals and hazardous waste disposal in the WTP paint department; and Dakkota, an auto parts manufacturer located in Hazel Park, Michigan.

10. Defendant elects its officers every three years, which include the positions of President, Vice-President, Financial Secretary-Treasurer, Recording Secretary, three Trustees, Sergeant-at-Arms, Guide, and six Executive Board Members At Large.

11. Members must be in good standing in order to vote in Local 140's elections.

12. In order to be in good standing, members must be current in their payment of dues.

13. Defendant conducted a regular union officer election on May 9, 2023, which was followed by a run-off election for certain positions on May 18, 2023.

14. On December 4, 2023, the United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") International Executive Board issued a decision ordering that the May 9, 2023, election be rerun.

15. Local 140 held the UAW-ordered rerun election on May 14, 2024 ("the election"), which was followed by a run-off election for certain positions on May 23, 2024.

16. The election was subject to the provisions of Title IV of the LMRDA, 29 U.S.C. §§ 481–483.

17. The election was overseen by an Election Committee whose members were elected at a regularly scheduled membership meeting.

18. The Election Committee Chair was Sam Jones.

19. Local 140 contracted with Election Source to assist with the election.

20. Election Source supplied tabulation machines and assisted with tabulating the election results.

21. The election was held at five in-person polling stations (four trailers and the union hall) from 4:00 AM to 11:00 PM.

22. Members eligible to vote were designated to vote at one of the five polling stations.

23. Each polling station had a list of the eligible voters ("eligibility list") designated to vote at that polling station.

24. Local 140 designed the following voting procedures for when a member entered their designated polling station:

    a. The member completed a ballot request slip.

    b. The member gave the ballot request slip and a form of identification to an Election Committee member or volunteer at the check-in table.

    c. The Election Committee member or volunteer located the member on that polling station's eligibility list and marked the list to indicate the member had requested a ballot.

    d. The member received a blank ballot, which they took to a voting booth, completed, and cast in a tabulation machine.

**B.    Challenged Ballots**

25. UAW's Guide for Local Election Committees (2019) ("the Guide") provides guidance for how to handle situations where a voter's eligibility is in question, including when the voter's name is not on the eligibility list at the polling station.

26. The Guide instructs that a voter whose eligibility is in question should cast a challenged ballot so that "Election Committee members can later review necessary records and resolve the eligibility question" and "the local union will be

in a position to count only those ballots which are cast by eligible members." Guide at 53.

27. The Guide includes the following instructions regarding casting challenged ballots:

    a. The voter whose eligibility is in question "should be directed to a voting booth or private voting area and instructed to mark the ballot, place it in the secret ballot envelope, seal it, put the sealed envelope in the larger challenged ballot envelope, and return it unsealed to an election official." Guide at 55.

    b. "Election Committee members should record on the larger challenged ballot envelope the voter's name, other identification information, the reason for the challenge, and the name of the person(s) who raised the challenge." Guide at 54.

    c. "Election Committee members should place a 'C' next to the challenged voter's name to indicate that the person voted a challenged ballot. If the person's name is not on the eligibility list, his or her name should be added to the bottom of the eligibility list and a 'C' placed next to the name." Guide at 55.

    d. "If a member scheduled to vote at a certain polling site appears at the wrong site (when multiple polling sites are used),

6

    Election Committee members should have the member vote a challenged ballot. In order to ensure that a person does not vote more than once, all ballots challenged for this reason must be later cross-checked at the ballot tally against the voter eligibility lists for all polling sites before the challenged ballots are opened and counted." Guide at 55.

e. "At the start of the tally of ballots, decisions about the counting of each challenged ballot should be announced to those in attendance and the reason for each decision should be explained to challengers. Election Committee members should record the decision as to whether to count the ballot on the front of the challenged ballot envelope (such as 'eligible' or 'not eligible – retired') and initial and date it." Guide at 56.

f. "If challenged ballots are resolved as eligible, Election Committee members should remove (but not open) the secret ballot envelopes from the outer envelopes and mix them together. In order to preserve secrecy, the secret ballot envelopes should then be opened and the ballots removed and mixed in with other uncounted ballots." Guide at 56.

7

28. During the election, Defendant did not implement a challenged ballot process that ensured only eligible members' votes were counted.

29. There were 166 names in total added by hand to the eligibility lists at the five polling stations.

30. These 166 individuals were allowed to vote regularly and were not made to cast challenged ballots.

31. Election Committee members did not keep records indicating how they resolved any questions about individuals' eligibility to vote on election day.

32. During the polling hours, Election Committee members did not contact the union officials with access to members' dues records in order to verify any voter's good standing.

33. After polling stations closed and before the results were announced, union officials with access to members' dues records were not asked to resolve any challenged ballots.

34. Defendant's records from the election contain no open or sealed challenged ballots or challenged ballot envelopes.

**C.   Absentee Ballots**

35. The election allowed for absentee voting in the form of early in-person voting at the union hall.

36. To vote absentee, a member had to either be on leave for union or company business on the day of the election.

37. Local 140 designed the following procedures for an eligible member to vote absentee:

    a. The member came to the union hall during certain time periods when an Election Committee member was present to assist with absentee voting.

    b. The member filled out a ballot request slip and was given a ballot.

    c. The member filled out the ballot, sealed it in a manila envelope and signed their name on the outside of the envelope.

    d. An Election Committee member locked the manila envelope with the voted ballot in the Election Committee cabinet.

    e. An Election Committee member indicated on the voter eligibility list that the member had cast an absentee ballot so that the member could not also vote in person on election day.

38. The Election Committee did not maintain and/or preserve a list of members who had requested and/or voted an absentee ballot.

39. The Election Committee did not indicate on the voter eligibility list(s) whether a member had voted absentee.

40. On the night of the ballot tally, outside of the presence of observers, Election Committee members opened the manila envelopes with the voted absentee ballots, mixed them up, and placed them in a single manila envelope.

41. The Election Committee members did not check to see if the members who had voted absentee had also voted in person at one of the polling sites.

42. Election Committee member(s) threw away the absentee ballot envelopes with the members' names and signatures.

43. The manila envelope with the voted absentee ballots was brought to the union hall and tabulated outside of the presence of observers.

**D.  Collection of Ballots and Ballot Tally**

44. Once the polling hours were over, relevant materials were gathered from each polling station as follows:

  a. An Election Source employee printed a tabulation tape from the tabulation machines at the polling station.

  b. The Election Committee and any present observers signed the printed tapes.

  c. The tabulation machines were unlocked and the voted ballots were placed in canvas bags.

  d. The tabulation tapes were placed with the ballots in the canvas bags.

      e. The canvas bags were sealed.

      f. The sealed ballot bags were ferried to the union hall by the Election Committee.

45. Observers were not allowed to watch the initial stages of the ballot tally at the union hall.

46. While observers were still excluded from the space used for the election tally, the seals on the canvas bags were opened and the printed tabulation tapes removed.

47. While observers were still excluded from the space used for the election tally, the Election Committee Chair brought a manila envelope containing approximately thirty voted ballots and an Election Source employee fed them through a tabulation machine.

**E.**    **Local 140's Election Results**

48. In the race for the office of President, Local 140's election results showed Eric Graham (with 956 votes) defeated Randall Person (with 679 votes).

49. The Department's recount of the ballots for the race for the office of President indicated that Eric Graham (with 963 votes) defeated Randall Pearson (with 673 votes).

50. Using the Department's recount results for the President race, the margin of victory was 290 votes.

51. In the race for three Trustee positions, Local 140's election results showed Precious S. McCoy (with 1012 votes) and Chris Fiebig (with 763 votes) each won a Trustee position. Brian Clark (with 611 votes) and Monica Braye (with 584 votes) competed in a runoff election for the remaining Trustee position.

52. In the Trustee race, the margin of victory between Fiebig (the last outright winner of a Trustee position) and Clark (the first runoff candidate) was 152 votes.

53. In the race for six Executive Board Member At Large positions, Local 140's election results showed Can Jackson (with 787 votes), Derrick Stewart (with 586 votes), and Rhonda Cooper (with 570 votes) each won a position. Pierre Jackson (with 494 votes), Retta Franklin (with 486 votes), Orlando Davis (with 421 votes), and Cecile Pruitt (with 407 votes) competed in a runoff election for the remaining three positions.

54. The Department's recount of the ballots for the race for six Executive Board Member At Large positions indicated Can Jackson (with 788 votes), Derrick Stewart (with 584 votes), and Rhonda Cooper (with 571 votes) each won a position. Pierre Jackson (with 494 votes), Retta Franklin (with 487 votes), Orlando Davis (with 422 votes), and Cecile Pruitt (with 408 votes) competed in a runoff election for the remaining three positions.

55. Using the Department's recount results for the Executive Board Member At Large race, the margin of victory between Cooper (the last outright winner of an Executive Board Member At Large position) and Pierre Jackson (the first runoff candidate) was 77 votes.

**F.  Local 140's Election Records**

56. Local 140's election records show there were 1,683 ballots cast in the election.

57. Thirty of the ballots were retiree ballots with votes only for Presidential Candidate Eric Graham and no votes in any other races. These thirty ballots were marked in a similar pattern using a black ballpoint pen, which differed from the markers provided by Election Source.

58. Local 140 did not preserve all of the ballot request slips that were filled out by voters when they arrived at the polling sites for the election.

59. In response to the Department's administrative subpoena, the Election Committee Chair only produced 478 undated ballot request slips.

60. Upon information and belief, each voter filled out a ballot request slip prior to voting, and Local 140 should have produced an additional 1,205 ballot request slips.

61. Local 140's election records allegedly contain the eligibility lists that were used by Election Committee members at each polling site to keep track of the voters who requested ballots.

62. The eligibility lists were not labeled clearly to indicate which polling site they were from.

63. The eligibility lists cannot be used to determine the identities of all of the individuals who voted in the election.

64. If all of the names highlighted and handwritten on the eligibility lists are included and totaled, the eligibility lists indicate 1,456 members requested a ballot.

65. If this 1,456 figure is used, there are 227 fewer names marked or handwritten on the eligibility lists than ballots cast.

66. If the duplicate names and those voters that appear to have been marked as having voted in the runoff election are accounted for, then there are 332 fewer names marked or handwritten on the eligibility lists than ballots cast.

67. At least fifteen (15) of the 166 individuals whose names were handwritten on the eligibility lists were not eligible to vote.

68. An additional eleven (11) of the 166 handwritten entries on the eligibility lists, could not be verified as eligible to vote, either because the names

were incorrectly or illegibly recorded or because these individuals were not members of Local 140.

69. If these fifteen (15) ineligible and eleven (11) unverifiable individuals among the handwritten entries are included, then there are of 347 fewer eligible members indicated as having requested a ballot on the eligibility lists than actual ballots cast.

**G.  Internal Union Exhaustion and Administrative Proceedings**

70. The procedure for protesting Local 140's officer election is set forth in UAW's Constitution.

71. Article 38, Section 11, of the UAW Constitution provides that election protests must be "raised within seven (7) days of the closing of the polls or at the next membership meeting, whichever is later," and that "[a] protest must either be in writing, or made at the membership meeting."

72. Pursuant to Article 33, Sections 2(a) and 4 and Article 38, Section 12 of the UAW Constitution, an appeal of the local union's decision may be made in writing to the International Executive Board (IEB) within 30 days.

73. Pursuant to Article 33, Section 2(a) of the UAW Constitution, a final appeal of the IEB's decision may be made to the Convention Appeals Committee or the Public Review Board.

74. Gail Massey ("Complainant") was a member in good standing of Local 140 at the time of the election and at the time she filed a complaint with the Secretary of Labor.

75. Complainant filed an initial election protest by letter to Local 140 Recording Secretary Carmen Burke on May 17, 2024.

76. Complainant's protest was read at Local 140's May 17, 2024 Executive Board meeting, but the Executive Board did not issue a decision on her protest.

77. Complainant's protest was read at Local 140's May 19, 2024 membership meeting, but no vote was taken on it.

78. The Administrative Assistant to UAW President Shawn Fain, in a letter dated July 22, 2024, advised that the "local union membership must hear [her] appeal at a membership meeting and vote to deny or grant the appeal" before she could appeal to the IEB.

79. In a letter dated September 4, 2024, Complainant asked Burke to have the Executive Board vote on her protest.

80. After having pursued internal remedies for three months without receiving a final decision, Complainant submitted a complaint to the U.S. Department of Labor on September 10, 2024, pursuant to section 402(a)(2) of the LMRDA, 29 U.S.C. § 482(a)(2).

16

81. On September 13, 2024, subsequent to the complaint filed with the Secretary, Local 140's Executive Board voted to deny Complainant's protest on behalf of the membership.

82. Pursuant to section 601 of the Act, 29 U.S.C. § 521, and in accordance with section 402(b) of the Act, 29 U.S.C. § 482(b), Plaintiff investigated the complaint and, as a result of the facts shown by her investigation, found probable cause that violations of Title IV of the Act, 29 U.S.C. §§ 481–483, occurred that have not been remedied and that may have affected the outcome of Defendant's May 13, 2024 election for the races of President, Trustee, and Executive Board Member At Large.

83. By letter signed October 25, 2024, Defendant agreed that the time within which Plaintiff may bring suit with respect to Defendant's aforesaid election be extended to Saturday, November 23, 2024.

84. By letter signed November 7, 2024, Defendant agreed that the time within which Plaintiff may bring suit with respect to Defendant's aforesaid election be extended to Saturday, November 30, 2024.

**FIRST CAUSE OF ACTION**

85. Section 401(c) of the Act, 29 U.S.C. § 481(c), provides that "[a]dequate safeguards to insure a fair election shall be provided, including the

right of any candidate to have an observer at the polls and at the counting of the ballots."

86. Defendant violated section 401(c) of the Act, 29 U.S.C. § 481(c), when it failed to ensure that only eligible voters were allowed to vote and that there was no duplicate voting by eligible voters.

87. Defendant violated section 401(c) of the Act, 29 U.S.C. § 481(c), when it prevented observers from witnessing the opening and counting of the absentee ballots and from observing the initial stages of the ballot tally at the union hall.

## SECOND CAUSE OF ACTION

88. Section 401(e) of the Act, 29 U.S.C. § 481(e), states that unions must "preserve for one year the ballots and all other records pertaining to the election."

89. Defendant violated section 401(e) of the Act, 29 U.S.C. § 481(e), when it failed to preserve the envelopes used by absentee voters and all of the ballot request slips filled out by voters.

90. The above violations of sections 401(c) and (e) of the Act, 29 U.S.C. §§ 481(c) and (e), may have affected the outcome of the races of President, Trustee, and Executive Board Member at Large in the election.

## PRAYER FOR RELIEF

91. WHEREFORE, Plaintiff prays for judgment:

(a) declaring Defendant's election for the offices of President, Trustee, and Executive Board Member At Large to be void;

(b) directing Defendant to conduct a new election, including new nominations, for these offices under the supervision of Plaintiff; and

(c) for the costs of this action; and

(d) for such other relief as may be appropriate.

Dated: November 26, 2024                Respectfully submitted,

                                        DAWN N. ISON
                                        United States Attorney

                                        /s/ Jonny Zajac
                                        JONNY ZAJAC
                                        Assistant United States Attorney
                                        211 W. Fort Street, Suite 2001
                                        Detroit, Michigan 48226
                                        (313) 226-0230
                                        jonny.zajac@usdoj.gov
                                        Illinois Bar No. 6307383

                                        *Counsel for Acting Secretary of Labor*

OF COUNSEL:

U.S. Department of Labor
SEEMA NANDA

Solicitor of Labor
BEVERLY DANKOWITZ
Associate Solicitor
JEFFREY LUPARDO
Counsel for Labor-Management and
Civil Rights Enforcement
CLAIRE KENNY
Senior Attorney